UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES MARK KELLER,

                          Plaintiff,

        v.

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
_____

DECISION & ORDER

16-CV-6399P

## PRELIMINARY STATEMENT

Plaintiff James Mark Keller ("Keller") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 15).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 11, 20).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

---

[1] On January 23, 2017, after this appeal was filed, Nancy A. Berryhill became Acting Commissioner of Social Security.

**BACKGROUND**

I.      **Procedural Background**

Keller protectively filed for DIB alleging disability beginning on May 12, 2012, as a result of anxiety and chronic cough.  (Tr. 250, 254).[2]  On March 1, 2013, the Social Security Administration ("SSA") denied Keller's claim for benefits, finding that he was not disabled.[3]  (Tr. 116).  Keller requested and was granted a hearing before Administrative Law Judge John R. Allen (the "ALJ").  (Tr. 127-28, 183-87).  The ALJ conducted a hearing on December 2, 2014.  (Tr. 72-104).  In a decision dated January 21, 2015, the ALJ found that Keller was not disabled and was not entitled to benefits.  (Tr. 42-60).

On April 7, 2016, the Appeals Council denied Keller's request for review of the ALJ's decision.  (Tr. 1-5).  Keller commenced this action on June 10, 2016, seeking review of the Commissioner's decision.  (Docket # 1).

II.      **Relevant Medical Evidence[4]**

A.      **Treatment Records**

1.      **Rochester Mental Health Center**

Treatment notes suggest that Keller was referred to and first attended an appointment at Rochester Mental Health Center ("RMHC") on July 13, 1998, for continued psychiatric care after his discharge from a partial hospitalization program.  (Tr. 424-25).  Keller met with Jay Hong ("Hong"), CSW, and reported symptoms of anxiety and depression.  (*Id.*).  He reported that he had lost his job as a driver for developmentally disabled clients the previous

---

[2]  The administrative transcript shall be referred to as "Tr. __."

[3]  Keller's previous claim for benefits was denied on October 15, 1999.  (Tr. 250).

[4]  Those portions of the treatment records that are relevant to this decision are recounted herein.

year and had been unable to obtain employment since his dismissal. (*Id.*). In the course of attempting to obtain career service assistance, he was referred for mental health treatment. (*Id.*). He briefly sought treatment at Family Services, but that organization referred him to the RMHC Partial Hospitalization Program. (*Id.*). At the time of the appointment with RMHC, Keller was forty-one years old and lived by himself. (*Id.*).

Keller reported that his father was an alcoholic and had been a long-time resident of the Rochester Psychiatric Center. (*Id.*). His brother had been diagnosed with schizophrenia and received inpatient care. (*Id.*). Keller reported that he had received a bachelor's degree and had previous employment history as a driver for developmentally disabled persons and a city school bus driver. (*Id.*). Keller reported that he attended an Adult Children of Alcoholics ("ACOA") group and received support from his mother. (*Id.*). He reported that he was a classical musician and enjoyed playing the piano. (*Id.*).

Upon examination, Keller presented as well-groomed, casually dressed, alert, fully oriented, with coherent thought form, general speech content, mildly depressed mood, and flat affect, and he related in a detached manner. (*Id.*). Hong opined that Keller had an idiosyncratic style of relating to others, which likely resulted in a lack of social support. (*Id.*). He assessed that Keller had a mental illness that resulted in functional deficits that likely would continue for a prolonged period in the areas of living, working, socializing, and learning. (*Id.*).

On July 21, 2011, Keller met with M. Saleem Ismail ("Ismail"), MD. (Tr. 614). During the appointment, Keller reported that he was doing "fine," was sleeping and eating well, and was connected to groups, his mother and his aunt. (*Id.*). He reported that he used Trazadone rarely to assist with sleep. (*Id.*). Upon examination, Ismail noted that Keller was casually dressed, with a linear thought process, fine mood, blunt affect, full orientation, fair memory,

good insight and judgment, and a fair fund of knowledge. (*Id.*). Keller denied that he was currently suffering or had ever suffered from hallucinations or delusions. (*Id.*).

Ismail noted that Keller suffered from depressive symptoms and an unclear history of psychosis, although he had been taking antipsychotic medication for several years. (*Id.*). He assessed that Keller's functioning was fair and without disabling symptoms or hospitalizations. (*Id.*). Ismail diagnosed Keller with depressive disorder, not otherwise specified, and assessed a Global Assessment of Functioning ("GAF") of 60. (*Id.*). Ismail suggested lowering Keller's Geodon dosage. (*Id.*).

Keller returned for an appointment with Ismail on November 10, 2011. (Tr. 612). During the appointment, Keller complained of dizziness and a chronic cough, for which he was receiving treatment. (*Id.*). He indicated that his sleep and appetite were good, denied excessive fatigue or depression, and reported that he had been working on his aunt's piano. (*Id.*). Upon examination, Ismail noted that Keller avoided eye contact, demonstrated partial insight and good judgment, and denied hallucinations or delusions. (*Id.*). Ismail noted that Keller suffered from mood disorder and possibly a personality disorder that resulted in sexual and interpersonal difficulties. (*Id.*). He continued Keller's current medication regimen. (*Id.*).

On January 30, 2012, Keller met with Shannon E. Mackey ("Mackey"), LMSW. (Tr. 610). Mackey indicated that she had recently taken over Keller's case and planned to meet with Keller every twelve weeks to discuss his symptoms and life stressors. (*Id.*). Keller reported that he had been stable for some time and was compliant with his medications. (*Id.*). Keller reported experiencing difficulty at work because a coworker insisted on playing music with profanity, which caused Keller to become angry, experience headaches, and take out his frustration on the residents. (*Id.*). Keller reported that he enjoyed yoga and found it to be a

4

useful coping skill.  (*Id.*).  Upon examination, Mackey noted that Keller presented a guarded attitude, constricted affect, and anxious mood.  (*Id.*).  Mackey indicated that Keller appeared anxious and preoccupied, but Keller denied feeling anxious.  (*Id.*).

On March 19, 2012, Keller attended an appointment with Douglas Landy ("Landy"), MD.  (Tr. 608-09).  At the time of the appointment, Keller was taking Geodon, Zoloft and Trazodone.  (*Id.*).  Keller reported that he was experiencing "bad thoughts," including feelings that he "should hate somebody."  (*Id.*).  Landy suggested that Keller also appeared to experience auditory hallucinations based upon Keller's reports that his coworker insisted on playing music containing a man's monotone voice speaking "every conceivable curse word and . . . racial epithets and various other nasty phrases."  (*Id.*).  Landy concluded that Keller might be experiencing hallucinations.  (*Id.*).  Keller indicated that he was not certain how long he had been experiencing problems, but Landy noted that in July 2011 Keller's dosage for Geodon had been lowered from 120 mg to 60 mg.  (*Id.*).

Upon examination, Landy noted that Keller interacted in an anxious manner with varied eye contact and speech cadence.  (*Id.*).  Landy opined that Keller "clearly has delusions and possibly hallucinations as well."  (*Id.*).  According to Landy, Keller appeared to have some awareness of a problem, but did not appreciate the nature of the problem, leading Landy to conclude that Keller had only partial insight.  (*Id.*).  Landy diagnosed Keller with schizophrenia and assessed a GAF of 45 to 50.  (*Id.*).  He recommended increasing Keller's Geodon dosage to 80 mg and noted that he would consider increasing the dosage further if necessary.  (*Id.*).

Keller returned for a medication review on March 23, 2012, and met with Amanda Lewis ("Lewis"), NPP.  (Tr. 606-07).  Lewis noted that Keller was working as a kitchen aide at an assisted living community and that he reported an "upbeat and good" mood and

normal sleep and appetite. (*Id.*). Keller indicated that he had just met with Landy, but was uncertain as to the purpose for the appointment. (*Id.*). Lewis reviewed the treatment notes and acknowledged that Keller had recently met with Landy and did not need an additional medication review. (*Id.*). After her "brief" meeting with Keller, Lewis concurred with the previous diagnoses of depression and schizophrenia. (*Id.*). She continued Keller's current medication regimen and advised him to follow up with Landy in twelve weeks. (*Id.*).

On July 11, 2012, Keller met with Kathryn Collina ("Collina"), MA, for his first therapy session with her. (Tr. 604). Keller denied any psychotic symptoms and indicated that he was compliant with treatment and doing well on his medications. (*Id.*). He indicated that he had a "good life" and strong relationships with his mother and friends. (*Id.*). He expressed a desire to return to work, and Collina referred him to an employment rehabilitation program. (*Id.*).

Keller met with Landy on July 16, 2012. (Tr. 596, 603). Keller continued to deny hallucinations or delusions and indicated that his mood was good, although he had been fired in the middle of May. (*Id.*). Keller reported that he was keeping busy by repairing his aunt's piano and walking daily. (*Id.*). Landy noted that Keller interacted in an idiosyncratic manner throughout the interview. (*Id.*). He diagnosed Keller with depressive disorder, not otherwise specified, schizophrenia, and personality disorder, not otherwise specified, and assessed a GAF of 55 to 60. (*Id.*).

During the remainder of 2012, Keller met with Collina approximately once a month. (Tr. 592-595, 597-602). In early fall 2012, Keller reported that he was doing well, looking for employment, tuning pianos, and playing the piano at churches and cafes. (*Id.*). Keller began to express concerns regarding his financial status and reported that his unemployment benefits would be expiring and he was considering applying for disability. (*Id.*).

In October 2012, Keller reported that he drove to Michigan to visit his nieces and nephews. (*Id.*). He reported symptoms of psychosis and anxiety, which he attributed to loud noises and poor sleep. (*Id.*).

Keller's case was transferred to Michael D. Simson ("Simson"), MD, due to Landy's departure. (Tr. 598-99). On October 22, 2012, Keller met with Simson for the first time. (*Id.*). Simson noted that since Landy's departure Keller's medication regimen had been altered due to insurance coverage issues and that he was now taking Perphenazine instead of Geodon. (*Id.*). Keller reported that the medication change had not affected his symptoms. (*Id.*). Nevertheless, he preferred Geodon and had arrived with paperwork to attempt to obtain a free supply. (*Id.*). He also had paperwork related to disability and vocational services. (*Id.*).

Keller indicated that he was aware that he had previously been diagnosed with schizophrenia, but did not believe that the diagnosis was correct, explaining that he had never suffered from hallucinations or delusions. (*Id.*). According to Keller, his primary symptoms were anxiety and periodic insomnia. (*Id.*). Keller reported that although his anxiety had been manageable recently, it had previously interfered with his ability to work. (*Id.*). Simson noted that Keller was soft-spoken with good eye contact, flat affect, and mild anxiety. (*Id.*).

Simson noted that Keller had previously been diagnosed with anxiety, depressive disorder, not otherwise specified, and personality disorder, not otherwise specified. (*Id.*). He acknowledged that Keller denied symptoms of schizophrenia, but indicated that persons suffering from schizophrenia generally have limitations in insight; for this reason, Simson indicated that Keller's self-report was not sufficiently reliable to rule out the diagnosis. (*Id.*). Simson continued the current medication regimen, but indicated that he would investigate restarting Geodon, which had a lower side effect profile for long-term use. (*Id.*).

During his appointments with Collina throughout the rest of 2012, Keller generally presented as anxious and restless, with a flat affect. (Tr. 592-95). He continued to express some interest in returning to work, but indicated that he was concerned about his ability to work due to his chronic cough. (*Id.*). Keller indicated that he continued to enjoy tuning pianos and playing gigs, and was considering applying for disability while continuing those activities. (*Id.*). Keller reported that he felt "bad" about considering applying for disability, but Collina attempted to reframe his thoughts about disability and assisted him in acquiring information about the application process. (*Id.*). Collina noted that Keller was a "voracious reader" and continued to engage in meditation, yoga, dance class, and tennis. (*Id.*). By the end of the year, Keller was considering work as a dishwasher through a career-services organization, but expressed disappointment that he could not find employment in a piano-related field. (*Id.*).

During 2013, Keller met with Simson approximately five times and continued to meet with Collina approximately once per month. (Tr. 572-91). During his initial appointments with Simson in January and April, Keller reported good control of his anxiety and that he was generally feeling good. (Tr. 584-85, 590-91). He denied racing thoughts and initially denied delusions, but acknowledged that he sometimes felt that people could read his mind and endorsed telepathy. (*Id.*). Simson noted that Keller presented with a flat and anxious affect and that his thought process was halting at times. (*Id.*). He diagnosed Keller with schizophrenia, depressive disorder, not otherwise specified, and personality disorder, not otherwise specified by history. (*Id.*).

Between February and June 2013, Keller met with Collina approximately five times. (Tr. 582-83, 586-89). During those appointments, Keller generally presented as restless and anxious, with racing thoughts and a depressed mood. (*Id.*). He repeatedly expressed his

reservations about obtaining employment as a dishwasher, primarily due to his chronic physical symptoms, including cough and frequent bowel movements. (*Id.*). Instead, Keller expressed a preference for obtaining disability benefits, while continuing to tune pianos and play gigs when such work was available. (*Id.*). According to Keller, he would be willing to volunteer or take a paid position working with pianos, but felt that he was physically unable to perform dishwashing or other cleaning duties. (*Id.*). Keller reported that he was able to live an active life, including volunteering, playing tennis, and attending dance classes, and had joined a movie-viewing group. (*Id.*). He also drove his mother to Michigan for his nephew's graduation. (*Id.*).

Between June and September 2013, Keller met with Simson on three occasions. (Tr. 574-75, 578-81). During those appointments, Keller reported increased anxiety, particularly in relation to financial stressors, including the impending termination of his unemployment benefits. (*Id.*). According to Simson, Keller presented as anxious, with a flat and mildly perplexed affect. (*Id.*). He continued at times to feel that others could read his mind. (*Id.*). He also reported some events that could have been auditory hallucinations, including comments from others that seemed unlikely to have actually occurred. (*Id.*). Simson reiterated Keller's previous diagnoses and maintained his medication regimen. (*Id.*).

Keller met with Collina approximately four times between August and December 2013. (Tr. 571-73, 576-77). During those visits, Keller generally presented as depressed and anxious, although he expressed interest in attending a PROS program and obtaining part-time employment. (*Id.*). Collina endorsed Keller's plan to attend the PROS program and to obtain part-time employment. (*Id.*). During this time, Keller continued to search for employment that would permit him to use his piano-playing skills and to engage socially, meditate, and exercise. (*Id.*). Keller reported that he enjoyed assisting his mother with household chores, as well as

meditating, performing yoga, jogging, and attending dance classes. (*Id.*). He also reported some difficulty during his PROS classes due to excessive auditory stimulation, including the loudness of the other participants. (*Id.*).

Keller met with Simson approximately four times during 2014. (Tr. 559-60, 564-65, 568-69, 644-45). During those visits, Keller reported that he was generally able to manage his anxiety with the help of his medication, although he noted anxiety stressors, including loud noises and being around many people. (*Id.*). Keller found that attending PROS classes was challenging due to the presence of other class participants. (*Id.*). Simson noted that Keller sometimes presented as anxious or depressed and sometimes averted his gaze. (*Id.*). He maintained the same diagnoses for Keller and continued him on the same medication regimen. (*Id.*).

Keller also met with Collina approximately seven times during 2014. (Tr. 561-63, 566-67, 570, 646). During those visits, Keller generally presented as anxious, although his mood was often euthymic, and he reported ongoing engagement with the PROS program, potential employment at a local grocery store and at a nature center, and continued engagement in social activities, including dancing, hiking, volunteering, and participation in a musicians' group. (*Id.*). Keller's mother attended one session and reported that Keller occasionally "spaces out" and appears to lose concentration and focus. (*Id.*). In September 2014, Keller reported some anxiety concerning his upcoming disability hearing, as well as concerns about where he would live if his mother passed away. (*Id.*).

### 2. <u>DePaul Personalized Recovery Oriented Services Program</u>

Keller attended a psychosocial evaluation with a licensed clinical social worker at the DePaul Personalized Recovery Oriented Services Program ("PROS") on October 24, 2013,

upon Collina's referral. (Tr. 649-57). Keller reported that he had obtained a degree in music theory from Fredonia State College and had worked some menial jobs for several years. (*Id.*). He was sporadically employed as a piano player. (*Id.*). He reported ongoing mental health treatment at RMHC for the previous fifteen years and active engagement in church, hiking, meditation, and dancing groups. (*Id.*).

During the evaluation, the social worker noted slowed speech, flat tone, somewhat constricted affect, somewhat slowed thought processing, and relevant thought content. (*Id.*). The evaluator noted that Keller had been unsuccessful in maintaining employment due to anxiety and schizophrenia-related skill deficits, including slowed responses, limited eye contact, and odd affect. (*Id.*).

During the course of his participation in the PROS program, Keller attended monthly review meetings with Eric DeCelle ("DeCelle"), MSW. (Tr. 677-92). During these meetings, Keller discussed his progress in the PROS classes, as well as his ongoing efforts to obtain employment. (*Id.*). DeCelle noted that Keller's eye contact was often intermittent, he appeared to struggle with cognitive distortions, and he became anxious when thinking of past difficulties. (*Id.*). He also exhibited difficulty remembering information and relied heavily upon his notes to assist his memory. (*Id.*). DeCelle noted that Keller did not always appear to recognize how his mental health symptoms might be affecting him. (*Id.*).

Throughout his participation in the program, Keller exhibited anxiety and had difficulty interacting socially with others and managing loud noises or people. (*Id.*). On a few occasions, DeCelle had to counsel Keller about his interactions with others, particularly concerning respecting boundaries and socially appropriate behavior. (*Id.*). Keller frequently had difficulty managing his anxiety in larger classroom settings and in interactions with others. (*Id.*).

He also had difficulty remembering the skills learned in class, appointments, and the location of his belongings. (*Id.*).

Keller's progress notes indicated that he struggled with loud noises in the classroom setting, which increased his anxiety. (Tr. 659). He also reported feeling worried, which resulted in tension and headaches. (*Id.*). According to the treatment notes, Keller engaged in depressive and negative self-talk, and his anxiety caused him to avoid communicating with coworkers and others, resulting in difficult interpersonal relationships at work. (*Id.*). Throughout his time in the program, Keller applied for several different positions, but continued to struggle with his anxiety. (Tr. 668).

Although Keller expressed his desire to leave the PROS program in December 2013, he graduated from the program in June 2014. (Tr. 647-48, 693-94). The discharge summary indicated that Keller initially struggled in the classroom setting due to noise and interpersonal challenges in the classroom, but the PROS staff made changes to the environment to make it more comfortable and taught him skills to manage his discomfort. (Tr. 647-48).

### B. Medical Opinion Evidence

#### 1. Yu-Ying Lin, PhD

On January 22, 2013, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a consultative psychiatric evaluation of Keller. (Tr. 426-29). Keller drove himself to the appointment and reported that he lived with his mother. (*Id.*). Keller also reported that he had obtained a bachelor's degree in a regular education setting. (*Id.*). Keller's previous employment as a kitchen aide lasted approximately thirteen years and ended in May 2012 when he was fired due to interpersonal difficulties. (*Id.*).

Keller reported that he had been receiving ongoing mental health treatment at RMHC since 1999, but had not been hospitalized for psychiatric treatment. (*Id.*). According to Keller, he had difficulty maintaining sleep and loss of appetite. (*Id.*). Keller reported occasional situational depressive symptoms, but had difficulty stating whether or not he suffered from depression. (*Id.*). He endorsed anxiety-related symptoms since 1999, including excessive worry, irritability, restlessness, and difficulty concentrating. (*Id.*). He reported that he had been diagnosed with schizophrenia, but denied auditory and visual hallucinations. (*Id.*). According to Keller, since 1999 he had felt that others could read his mind and would think negatively of him. (*Id.*).

Keller reported that he was able to care for his personal hygiene and perform household chores, including cleaning, laundry, and shopping, although his physical impairments and allergies sometimes made those tasks difficult to complete. (*Id.*). According to Keller, he did not cook due to his allergies and his mother assisted him to manage his finances. (*Id.*). He reported that he was able to drive and to take public transportation. (*Id.*). Keller indicated that he had a good relationship with his family and friends and that he practiced yoga and meditation as coping mechanisms. (*Id.*).

During the interview, Lin noted that although Keller's demeanor was cooperative, his manner of relating was poor. (*Id.*). Upon examination, Keller was well-groomed and dressed appropriately, had normal motor behavior and posture, and poor eye contact. (*Id.*). According to Lin, Keller looked at the floor and sat facing away from Lin throughout the examination. (*Id.*). At Lin's inquiry, Keller stated that he does not like to look at women. (*Id.*). Lin opined that Keller had fluent, clear speech with adequate language, coherent and goal-directed thought processes, an affect that was slightly inappropriate to speech and thought content, clear

sensorium, full orientation, and average intellectual functioning with a general fund of information that was appropriate to experience. (*Id.*). Although Keller reported a euthymic mood, Lin observed him to be slightly dysphoric. (*Id.*). Lin noted that Keller's attention and concentration were intact. (*Id.*). Keller was able to perform simple counting calculations and serial three exercises. (*Id.*). According to Lin, Keller's recent and remote memory skills were moderately impaired due to current psychiatric disorder. (*Id.*). Keller could recall three out of three objects immediately and zero out of three objects after five minutes, and could complete six digits forward and three digits backward. (*Id.*).

Lin opined that Keller could follow and understand simple directions, perform simple tasks independently and complex tasks with supervision, maintain attention and concentration, maintain a regular schedule, and learn new tasks. (*Id.*). Lin further opined that Keller could not make appropriate decisions at times, could not relate adequately with others, and could not deal appropriately with stress. (*Id.*). According to Lin, Keller's difficulties were caused by his distractibility, and the results of the examination appeared consistent with psychiatric problems that could significantly interfere with Keller's ability to function on a daily basis. (*Id.*). Lin diagnosed Keller with mood disorder, not otherwise specified, and rule out schizophrenia, and opined that his prognosis was guarded and he would need assistance to manage his funds due to his current psychiatric state. (*Id.*).

## 2. **T. Harding, PhD**

On February 21, 2013, agency medical consultant T. Harding ("Harding"), PhD, completed a Psychiatric Review Technique. (Tr. 109-10). Harding concluded that Keller's mental impairments did not meet or equal Listing 12.04. (*Id.*). According to Harding, Keller suffered from mild limitations in his activities of daily living and moderate limitations in his

ability to maintain social functioning and concentration, persistence and pace.  (*Id.*).  According to Harding, there was no evidence that Keller had suffered from repeated episodes of deterioration.  (*Id.*).

Harding completed a mental residual functional capacity ("RFC") assessment. (Tr. 111-13).  Harding opined that Keller suffered from moderate limitations in his ability to understand, remember and carry out detailed instructions, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting.  (*Id.*).

### 3. __Collina and Simson__

In August 2014, Collina and Simson completed a mental impairment questionnaire relating to Keller.  (Tr. 625-30).  They indicated that Keller suffered from schizophrenia, paranoid, chronic, and depressive disorder, not otherwise specified, and assessed a GAF of 60.  (*Id.*).  According to Collina and Simson, Keller demonstrated a flat affect, poor insight, limited eye contact, moderate paucity of thought, mildly slowed movements, generalized anxiety, and paranoia.  (*Id.*).  They assessed that his prognosis was fair with continued treatment and medication compliance.  (*Id.*).

Collina and Simson reported that Keller's symptoms included decreased energy, blunt, flat or inappropriate affect, poverty of content of speech, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, paranoid thinking or inappropriate suspiciousness, emotional withdrawal or isolation, perceptual

or thinking disturbances, hallucinations or delusions, illogical thinking, easy distractibility, and oddities of thought, perception, speech and behavior. (*Id.*). They opined that Keller had no useful ability to function[5] in several work-related areas, including working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday or workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with the stress of semiskilled and skilled work. (*Id.*).

They also opined that Keller was unable to meet competitive standards[6] in several work-related areas of functioning, including remembering work-like procedures, understanding, remembering and carrying out very short and simple instructions, understanding and remembering detailed instructions, maintaining attention for two-hour segments, maintaining regular attendance and being punctual within customary, usually strict tolerances, sustaining an ordinary routine without special supervision, asking simple questions or requesting assistance, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, interacting appropriately with the general public, maintaining socially appropriate behavior, and traveling in unfamiliar places. (*Id.*). Collina and Simson opined that Keller was

---

[5] "No useful ability to function" was defined as an extreme limitation, meaning the individual could not perform the activity on a regular, reliable and sustained schedule in a regular work setting. (*Id.*).

[6] "Unable to meet competitive standards" was defined to mean that the individual had noticeable difficulties (*e.g.*, would be distracted from the job activity) from 21 to 40 percent of the workday or workweek. (*Id.*).

seriously limited[7] in his ability to adhere to basic standards of neatness and cleanliness and use public transportation.  (*Id.*).

According to Collina and Simson, Keller's difficulties stemmed from his chronic schizophrenia, which extremely limited his ability to interact with groups, caused him difficulty in reading social cues and following instructions, and rendered him very anxious, causing him to have difficulty handling environmental stressors.  (*Id.*).  They opined that he suffered from marked to extreme limitations in his ability to maintain concentration, persistence and pace, marked limitations in his ability to maintain social functioning, and moderate limitations in his ability to engage in activities of daily living.  (*Id.*).  They also indicated that he had suffered from one or two episodes of decompensation of at least two weeks duration within a one-year period.  (*Id.*).

Collina and Simson opined that Keller suffered from a medically documented history of mental disorder of at least two years' duration; "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Keller] to decompensate"; and, a "[c]urrent history of 1 or more years' of inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement."  (*Id.*).  According to Collina and Simson, they expected that Keller would be absent from work more than four days per month and would have difficulty working at a regular job on a sustained basis due to his high anxiety in stressful situations.  (*Id.*).  They indicated that Keller would be unable to manage benefits in his own best interests.  (*Id.*).

---

[7]  "Seriously limited" was defined to mean that the individual had noticeable difficulty (*e.g.*, would be distracted from job activity) from 11 to 20 percent of the workday or workweek.  (*Id.*).

III.     **Non-Medical Evidence**

   A.     **Adult Career and Continuing Education Services Vocational Rehabilitation**

On July 31, 2012, Keller met with Kimberly M. Kenney ("Kenney"), an assessment counselor at the Adult Career and Continuing Education Services Vocational Rehabilitation, to obtain assistance to achieving full-time employment.  (Tr. 443-46).  Keller reported previous employment at an assisted living center as a kitchen aide for approximately twelve years.  (*Id.*).  His responsibilities included washing dishes and helping to prepare food.  (*Id.*).  Keller reported that his employment was terminated after he left work early.  (*Id.*).  He also reported previous employment driving a bus for developmentally disabled individuals and driving a bus for school children.  (*Id.*).  He reported that he was terminated from the first and quit the second.  (*Id.*).

During the evaluation, Keller was timid, ambulated slowly, and avoided eye contact.  (*Id.*).  He sat with his body turned away from Kenney, appeared uncomfortable, and had difficulty elaborating on his responses.  (*Id.*).  Keller reported severe symptoms of anxiety, racing thoughts and depression after losing his employment in 1997, but indicated that he believed his medication had helped.  (*Id.*).  Keller had been diagnosed with schizophrenia and depressive disorder and had several work-related limitations, including an inability to be around repetitive loud noises and difficulties with anger management, patience, stress, and pressure.  (*Id.*).

Based upon the assessment, Keller's vocational counselor Elizabeth Skender ("Skender") opined that Keller would require a supported employment environment.  (Tr. 447-48).  During their initial meeting on September 25, 2012, Skender noted that Keller had an "odd" presentation, which likely limited his ability to socialize.  (*Id.*).  Skender opined that a

supported work environment would be necessary because Keller "misses social cues" and "misinterprets non-verbal social signals." (*Id.*).

Skender met with Keller approximately once a month between October 2012 and March 2013 to assist with his employment search. (Tr. 479, 482, 485, 488, 492, 495). During those meetings, Keller expressed interest in searching for employment opportunities that would utilize his piano skills and told Skender that he could not work in food service due to his chronic cough. (*Id.*). He also indicated that he was not interested in a cleaning position due to his reaction to the odors. (*Id.*). Skender noted that Keller required employment in a quiet setting and continued to have difficulty maintaining eye contact during interviews. (*Id.*). He also frequently needed to use the restroom. (*Id.*). During March and April 2013, Keller expressed ambivalence about his job search and indicated that he was applying for social security benefits. (*Id.*).

**B.** **Application for Benefits and Administrative Hearing**

In his application for benefits, Keller reported that he was born in 1956. (Tr. 250). Keller reported that he had completed four or more years of college and had previously been employed as a kitchen aide and van driver. (Tr. 255). According to Keller, he was last employed in 2012, and his employment had ended due to his impairments. (Tr. 254).

Keller reported that he lived with his mother, did not care for any family members or pets, and was able to care for his own personal hygiene. (Tr. 263-64). Keller reported that he was able to prepare some meals, but found it difficult to cook due to his chronic cough and allergies. (Tr. 265-66). He reported that he was able to participate in household chores, including laundry, cleaning and raking leaves, but was unable to work with cleaning chemicals due to his cough and allergies. (Tr. 266). Keller reported that he left his residence daily and was

able to walk or drive. (*Id.*). He went grocery shopping approximately twice a week and was able to manage some of his finances. (Tr. 267).

Keller reported that during a typical day he took a walk, completed errands, took a nap, attended health appointments, learned computer skills, played the piano, and attended social groups up to five times per week. (Tr. 264). He reported that he enjoyed reading, watching television, using the computer, playing the piano, and dancing. (Tr. 267). Keller indicated that he interacts with family, speaks to friends on the phone, and attends several groups, including dancing, church, meditation, and walking groups. (Tr. 268). Keller reported some limitations due to his physical impairments that caused frequent coughing and bowel movements. (Tr. 270-71). According to Keller, he had difficulty getting along with coworkers during his previous employment positions. (Tr. 270).

During the administrative hearing, Keller testified that he had lived with his mother for the previous three years. (Tr. 78). According to Keller, he had a driver's license and drove daily. (Tr. 78). Keller testified that sporadically he was paid to appraise or tune pianos. (Tr. 79-80). Keller indicated that he had attempted to find employment as a kitchen aide or piano teacher, but had ceased looking. (Tr. 80, 96-97). Keller could not clearly articulate why he had stopped looking for employment, although he indicated that he had anxiety about returning to work. (Tr. 97).

According to Keller, he had previously been employed as a kitchen aide and a van driver. (Tr. 81-82). Keller testified that he had been fired from his position as a kitchen aide after he left work early as a result of being overtired. (Tr. 83-84). According to Keller, he likely would still be working in that position had he not been fired, although his physical impairments – frequent coughing and bowel movements – interfered with his ability to discharge his

responsibilities. (Tr. 83-85, 94-95). Keller testified that he suffered from anxiety and received ongoing mental health treatment from a psychiatrist and a therapist. (Tr. 87).

He indicated that during a typical day he attended programs at a mental health center, participated in group activities, and volunteered once a week for a half-day at a nature center, picking up trash, stacking firewood, and cleaning. (Tr. 89-90). From time to time, Keller was hired to play piano at a senior living center. (Tr. 90). He testified that he socialized with friends and performed household chores, including raking the leaves, emptying the garbage, clearing the gutters, and shoveling snow. (Tr. 91). He testified that he cared for his elderly mother. (Tr. 91-92).

Vocational expert Mable Burnette ("Burnette") also testified during the hearing. (Tr. 98-103). The ALJ asked Burnette to characterize Keller's previous employment. (Tr. 99). According to Burnette, Keller previously had been employed as a kitchen aide and a van driver. (*Id.*).

The ALJ asked Burnette whether a person would be able to perform Keller's previous jobs who was the same age as Keller, with the same educational and vocational profile, who had no exertional limitations, but was limited to simple, repetitive tasks, and was unable to engage in fast-paced or strict time-limited tasks. (Tr. 100). Burnette testified that such an individual would be unable to perform the previously-identified jobs, but would be able to perform other positions in the national economy, including office helper, cashier, and mailroom clerk. (*Id.*). The ALJ then added the additional limitations of avoiding concentrated exposure to environmental irritants and requiring ready access to a restroom. (*Id.*). Burnette testified that the identified positions would remain available. (*Id.*). Finally, the ALJ asked Burnette to assume the same limitations and to assume also that the individual would need to take up to eight

restroom breaks throughout the day in addition to meals and scheduled breaks.  (Tr. 101-02).

Burnette testified that this additional requirement would preclude competitive employment.

(Tr. 102).

## **DISCUSSION**

### I.    **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.     The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims. (Tr. 45-56). Under step one of the process, the ALJ found that Keller had not

engaged in substantial gainful activity since May 12, 2012, the alleged onset date. (Tr. 47). At

step two, the ALJ concluded that Keller had the severe impairments of anxiety and mood

disorder with some history of reported psychotic symptoms. (Tr. 47-48). The ALJ determined

that Keller's alleged impairments of dizziness, chronic cough, odor sensitivity, and status post

colectomy were not severe. (*Id.*). The ALJ also determined that Keller's alleged impairment of

schizophrenia did not constitute a medically determinable impairment. (Tr. 51). At step three,

the ALJ determined that Keller did not have an impairment (or combination of impairments) that

met or medically equaled Listings 12.04 or 12.06. (Tr. 48-50). With respect to Keller's mental

impairments, the ALJ found that Keller suffered from moderate difficulties in maintaining

concentration, persistence and pace, and mild limitations in social functioning and activities of

daily living. (*Id.*). The ALJ concluded that Keller had the RFC to perform the full range of work

at all exertional levels, but was limited to simple, routine, repetitive tasks, and could not perform

fast-paced or strict time-limited tasks. (Tr. 50-54). At steps four and five, the ALJ determined

that Keller was unable to perform past work, but could perform other jobs in the local and national economy, including office helper, cashier, and mailroom clerk.  (Tr. 54-55).  Accordingly, the ALJ found that Keller was not disabled.  (*Id.*).

B. **Keller's Contentions**

Keller contends that the ALJ's RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 13).  First, Keller maintains that the ALJ erred at step two by failing to find that his diagnosed schizophrenia was a medically determinable impairment.  (Docket ## 13 at 13-14; 21 at 2-3).  Next, Keller maintains that the ALJ's step two error was not harmless because it infected the remainder of the sequential analysis, including the ALJ's step three analysis, RFC assessment, and the hypothetical posed to the vocational expert at step five.  (Docket ## 13 at 14-16, 23; 21 at 2-4).  Keller also maintains that the ALJ's RFC assessment was not based upon substantial evidence because he erred in evaluating the opinion evidence.  (Docket # 13 at 16-23).

II. **Analysis**

Keller challenges the ALJ's determination that his schizophrenia was not medically determinable at step two and contends that the error infected the remainder of the ALJ's sequential evaluation.  (Docket ## 13 at 13-16; 21 at 2-4).  The Commissioner maintains that substantial evidence supports the ALJ's determination and that even if the ALJ had erred in finding that Keller's schizophrenia was not severe, such error was harmless.  (Docket # 20-1 at 12-14).  As discussed below, the Commissioner mischaracterizes the ALJ's determination and misapprehends the significance of the ALJ's conclusions at step two.

Pursuant to the regulations, disability may be found only if a claimant has a medically determinable impairment. *See* 20 C.F.R. § 404.1505(a). Such an impairment must "result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [plaintiff's] statement of symptoms." 20 C.F.R. § 404.1508.[8] The evidence that may establish a medically determinable impairment must come from "acceptable medical sources," such as licensed physicians. 20 C.F.R. § 404.1513(a).

At step two of the evaluation, the ALJ must determine whether the claimant has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520 (a)(4)(ii), (c). "An impairment or combination of impairments is 'not severe' when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have at most a minimal effect on an individual's ability to perform basic work activities." *Jeffords v. Astrue*, 2012 WL 3860800, *3 (W.D.N.Y. 2012) (quoting *Ahern v. Astrue*, 2011 WL 1113534, *8 (E.D.N.Y. 2011)); *see also Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y. 2013) ("[a]n impairment is severe if it causes more than a *de minimis* limitation to a claimant's physical or mental ability to do basic work activities"). "[S]ymptom-related limitations and restrictions must be considered at [ ] step [two] of the sequential evaluation process, provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms." SSR 96-3p, 1996 WL 374181, *2 (July 2, 1996). If an impairment is not medically determinable, it cannot be severe within the meaning of the SSA, and "symptom-related limitations and

---

[8] The current version of this regulation, which became effective March 27, 2017, is codified at 20 C.F.R. § 404.1521.

restrictions allegedly resulting from that impairment cannot be considered at step two of the sequential process." *Huskey v. Astrue,* 2007 WL 2042504, *7 (D. Kan. 2007).

In his decision, the ALJ concluded that Keller suffered from the severe mental health impairments of anxiety and mood disorder with some history of reported psychotic symptoms. (Tr. 47). With respect to Keller's alleged schizophrenia, the ALJ specifically concluded that this impairment was "not shown to be medically determinable on this record." (Tr. 51). I easily conclude that the ALJ's determination that Keller did not suffer from a medically determinable impairment of schizophrenia is not supported by substantial evidence in the record. The record is replete with diagnoses from Keller's treating providers that he suffers from schizophrenia. (Tr. 419, 457, 542, 560, 565, 569, 572, 575, 579, 580, 584, 591, 594, 603, 608-09, 641, 645). The medical records demonstrate that as early as 1998 Keller was suspected to suffer from schizophrenia. (Tr. 425). He has received ongoing mental health treatment since that time and has consistently been prescribed antipsychotic medication before and throughout the relevant period. (Tr. 614).

In reaching his conclusion that schizophrenia was not medically determinable, the ALJ relied upon the fact that Keller failed to list schizophrenia as an impairment in his application for benefits. (Tr. 51). However, the regulations clearly provide that the fact "[t]hat plaintiff did not specifically allege [an impairment] in [his] initial benefits applications is not dispositive . . . [and the] rule requires an ALJ to investigate the disabling effects of an impairment if the record contains evidence indicating that such an impairment might exist . . . [,] without regard to whether the claimant has alleged that particular impairment as a basis for disability." *Prentice v. Apfel*, 11 F. Supp. 2d 420, 426 (S.D.N.Y. 1998) (citing 20 C.F.R. § 404.1512(a)). The ALJ's reliance upon Keller's failure to list schizophrenia is particularly

troublesome because the treatment records repeatedly suggested that Keller had poor insight into his mental health impairments; indeed, Keller routinely attributed his limitations to anxiety rather than to any schizophrenic disorder, despite his providers' diagnoses.

The ALJ determined that "many psychological reports do not substantiate th[e] diagnosis" and cited treatment records from Keller's primary care physician and RMHC; in fact, both set of records contain multiple references to a diagnosis of schizophrenia. (*Id.*). The one report relied upon by the ALJ that did not diagnose schizophrenia, Harding's report, does not indicate whether schizophrenia was considered and rejected or overlooked altogether.[9] Given the repeated and consistent diagnosis of schizophrenia by Keller's treating providers, who observed and recorded Keller's signs and symptoms during treatment sessions occurring over the course of several years, coupled with his long-standing treatment with antipsychotic medication, the ALJ erred by concluding that schizophrenia was not a medically determinable impairment. *See Showers v. Colvin*, 2015 WL 1383819, *7 (N.D.N.Y. 2015) (ALJ erred in concluding that the record lacked evidence of mental health impairments; "[the evaluating physician's] diagnoses of personality disorder, depression and anxiety were based on sufficient medical evidence consisting of symptoms, signs, and laboratory findings[;] . . . and [the ALJ's] rejection of them was error"); *Schadt v. Soc. Sec. Admin., Comm'r*, 2012 WL 1910083, *6 (D. Vt. 2012) ("[t]he [c]ourt finds that the ALJ erred in determining at step two that [plaintiff] was not disabled because she did not have a medically determinable impairment"); *Carpenter v. Astrue*, 2011 WL 3951623, *9 (D. Vt. 2011) (ALJ erred in concluding impairment was not medically determinable despite diagnoses from several acceptable medical sources and medical evidence establishing

---

[9] In addition, despite the substantial evidence demonstrating that Keller suffered from anxiety, an impairment that the ALJ found to be severe at step two, Harding failed to analyze the listing associated with anxiety; instead, he evaluated only Listing 12.04, associated with depressive, bipolar and related disorders. (Tr. 110).

signs, symptoms, and laboratory findings; "[o]n the facts of this case, it was error for the ALJ to find that [p]laintiff's [impairment] was not medically determinable").

The Commissioner maintains that there was no error at step two because the "ALJ did not specifically find that [p]laintiff's schizophrenia was not a severe impairment." (Docket # 20-1 at 13). The Commissioner maintains that the ALJ did consider Keller's schizophrenia, and its attendant symptoms or limitations, because the diagnosis was encompassed within the broader mental health impairment of "mood disorder with some history of psychotic symptoms," which the ALJ found to be severe. (*Id.*). Thus, the Commissioner reasons, because the ALJ considered Keller's "history of psychotic symptoms," the ALJ actually found Keller's schizophrenia to be severe. (*Id.*). The Commissioner's position erroneously conflates a diagnosis of mood disorder with a diagnosis of schizophrenia and suggests that the two diagnoses result in the same functional limitations. *See Carter v. Astrue*, 2011 WL 3510570, *5 (M.D. Ala. 2011) (discussing at length differences between schizophrenia and major depressive disorder; "[m]ore disturbing, however, is the Commissioner's position that the ALJ's failure to consider [plaintiff's] schizophrenia at step two is simply harmless error because the plaintiff has not demonstrated that the limitations caused by major depressive disorder and chronic paranoid schizophrenia are different").

The Commissioner also maintains that even if the ALJ erred in this respect, such error was harmless because the ALJ proceeded through the sequential process and specifically considered Keller's mental health impairments during the subsequent steps. (*Id.* at 13-14). Although the Commissioner is correct that "[a]n error at step two may be harmless if the ALJ identifie[d] other severe impairments at step two, proceed[ed] through the remainder of the sequential evaluation process and specifically consider[ed] the 'nonsevere' impairment during

subsequent steps of the process," *see Wilson v. Colvin*, 2015 WL 1003933, *20 (W.D.N.Y. 2015), the ALJ's error in this case stemmed not from a *severity* conclusion, but from the conclusion that Keller's schizophrenia was not a *medically determinable impairment*. The distinction is significant because the step two harmless error doctrine is inapplicable to a determination that an impairment is not medically determinable. *See Showers v. Colvin*, 2015 WL 1383819 at *8 (harmless error doctrine not applicable to determination that impairment was not medically determinable; "[s]ince [the ALJ] found that [plaintiff's] claimed personality disorder, depression and anxiety were not medically-determinable abnormalities rising to the level of impairments, functional limitations attributable thereto were never considered at subsequent evaluative steps or when formulating [plaintiff's] residual functional capacity"); *Carpenter v. Astrue*, 2011 WL 3951623 at *8 n.4, 9 ("[e]ven the Commissioner acknowledges, as he must, the difference between finding an impairment not medically determinable, and finding it not severe"; "the court cannot find that this error was harmless because SSR 96-3 provides that symptom-related limitations will only be considered if the impairment to which they related is medically determinable[;] [b]ecause the ALJ found [plaintiff's impairment] not medically determinable, the ALJ did not consider symptoms related to it in his RFC assessment"); *see also Childs v. Colvin*, 2016 WL 1127801, *3 (W.D.N.Y. 2016) ("[i]n this case, the ALJ did not determine that plaintiff's schizoaffective disorder was *non-severe*; rather, he concluded that she did not suffer from the disorder at all[;] . . . at a minimum, the ALJ failed in his duty to consider the combined impact of plaintiff's medically-determinable impairments… throughout the disability determination process") (internal quotations and brackets omitted). Accordingly, remand is necessary for the ALJ to properly evaluate Keller's schizophrenia at step two and at the remaining steps of the sequential evaluation process. *See Showers*, 2015 WL

1383819 at *9 (remanding for ALJ to consider additional mental health impairments at step two and the subsequent steps; "[a]bsent his [s]tep [two] error[,] . . . [the ALJ] would have assessed [the additional impairments'] severity[, and] [w]hether he found them severe or not, he would have considered their combined effects when determining [plaintiff's] [RFC][;] [i]n so doing, he likely would have added limitations commonly associated with [those mental health impairments]"); *Schadt v. Soc. Sec. Admin., Comm'r*, 2012 WL 1910083 at *7 ("the matter must be remanded for a new analysis at step two, and beyond if necessary"); *Carpenter*, 2011 WL 3951623 at *9 ("[r]emand is necessary for the ALJ to properly evaluate [p]laintiff's [impairment] at step two"); *see also Childs v. Colvin*, 2016 WL 1127801 at *4 ("[t]he ALJ's failure to consider plaintiff's schizoaffective disorder at both steps two and three of the sequential evaluation process constituted reversible error, because a full consideration of plaintiff's disorder could have affected the outcome of her application"). Because remand is appropriate for further evaluation at step two, I need not reach Keller's remaining contentions regarding other errors in the sequential evaluation.

    Even assuming, however, that the harmless error doctrine could be applied to the ALJ's error, I disagree with the Commissioner that it is clear from the decision that the ALJ considered and accounted for the limitations associated with Keller's schizophrenia during the remainder of the sequential evaluation. My review of the ALJ's decision suggests that he overlooked or failed to account for limitations that are likely associated with Keller's schizophrenia. As an initial matter, as noted by the parties, the ALJ failed to assess whether Keller's impairments met or medically equaled Listing 12.03, the listing associated with the schizophrenia spectrum and other psychotic disorders. Instead, the ALJ only considered Listings 12.04, related to depressive, bipolar and related disorders, and 12.06, related to anxiety and

obsessive-compulsive disorders. As noted above, because I have determined that a remand for further evaluation at step two is necessary, I need not reach the issue of whether the ALJ's failure to specifically consider Listing 12.03 requires remand. Yet, the ALJ's failure to consider this listing underscores the likelihood that the ALJ failed to consider schizophrenia-associated limitations during the remainder of the sequential evaluation.

Further, the record in its entirety suggests that despite his extensive activities of daily living, Keller suffers from several mental limitations, particularly when interacting with others, that could interfere with his ability to complete work-related activities and were not accounted for by the ALJ in his RFC. Significantly, the record demonstrates that Keller experienced interpersonal conflicts and difficulty managing exposure to loud noises during his previous employment. His treating provider at the time, Landy, attributed Keller's difficulties to likely delusions or hallucinations. Keller's treating providers repeatedly reported that he interacted in an idiosyncratic manner, frequently avoided eye contact, and demonstrated depressive or anxious feelings. Keller repeatedly reported difficulty managing his anxiety in groups of people or when interacting with others, and reported ongoing difficulties with loud or repetitive noises. Indeed, Keller considered withdrawing from the PROS classes due to his inability to navigate a large group setting, particularly given the noise level of the classroom. Only after the PROS staff made modifications to accommodate Keller did he agree to continue.

The vocational service provider staff, as well as Lin, noted his limited eye contact and poor manner of relating. They also noted his apparent difficulty with memory, including substantial reliance on note-taking to assist his memory. Keller required counseling to manage his interactions with others, particularly as to appropriate boundaries and socially appropriate behavior. Similarly, Collina and Simson opined that Keller's chronic schizophrenia caused him

difficulty interacting with groups, reading social cues, and following instructions. These difficulties increased his anxiety and impeded his ability to manage environmental stressors effectively.

The ALJ's RFC assessment, which limited Keller to simple work not requiring quotas or production-paced work, simply does not account for many of the mental limitations identified in the record. In his decision, the ALJ discounted record evidence that Keller suffered from several mental limitations affecting his ability to interact with others, suggesting that there was either conflicting or inconsistent information regarding Keller's poor manner of relating, variable eye contact, and inability to appreciate social cues. (Tr. 49). The ALJ ignored or overlooked evidence in the record suggesting that Keller suffered from paranoia, delusions, or hallucinations. (Tr. 51). Likewise, the ALJ ignored or overlooked repeated references in the record to Keller's difficulty managing loud noises in work or classroom settings. Ultimately, the ALJ concluded that Keller's broad range of daily living activities contradicted any record evidence suggesting that Keller suffered from limitations affecting his memory, ability to interact with others, or his ability to manage stress.

Although the ALJ did not err in noting that Keller participated in extensive activities of daily living, it is not clear whether the ALJ's failure to acknowledge Keller's schizophrenia as a medically determinable impairment influenced his decision to discount significant record evidence suggesting that Keller suffers from additional mental limitations not accounted for in the RFC. Remand is thus appropriate for further consideration of the record, taking into account Keller's medically determinable impairment of schizophrenia.

Of course, even if Keller is determined on remand to suffer from additional schizophrenia-related mental limitations, such a determination does not conclude the inquiry and

compel a finding of disability. Rather, any schizophrenia-related limitations for which there exists substantial evidence in the record must be accounted for in the RFC, and a vocational expert should be consulted to determine whether positions exist in the national economy considering those limitations.

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 20)** is **DENIED**, and Keller's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September 18, 2017